**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SONDRA DENNISON, | ) | |
| | ) | |
| Plaintiff, | ) | 2:20-cv-1563 |
| | ) | |
| v. | ) | |
| | ) | Judge Marilyn J. Horan |
| INDIANA UNIVERSITY OF | ) | |
| PENNSYLVANIA, THOMAS SEGAR, | ) | |
| and MICHAEL DRISCOLL, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

In October 2020, Plaintiff, Dr. Sondra Dennison, filed suit against Defendants, Indiana

University of Pennsylvania, Dr. Thomas Segar, and President Michael Driscoll.  (ECF No. 1).  In

April 2021, Dr. Dennison filed an Amended Complaint seeking relief pursuant to 42 U.S.C. §

1983 for retaliation for speaking about a matter of public concern in violation of the First and

Fourteenth Amendments of the Constitution, 20 U.S.C. § 1681 et seq. (Title IX), 42 U.S.C. §

2000e et seq. (Title VII), 29 U.S.C § 794 (Rehabilitation Act), 42 U.S.C. § 12111 et seq.

(Americans with Disabilities Act), and 29 U.S.C. § 621 et seq. (Age Discrimination in

Employment Act).  (ECF No. 23).

Discovery has been completed, and the Defendants have filed a Motion for Summary

Judgment.  (ECF No. 39).  The present Motion for Summary Judgment has been fully briefed,

and the Motion is now ripe for decision.  (ECF Nos. 39, 40, 41, 42, 49, 50, 51, 58, 59).  Based on

the following reasoning, Defendants' Motion for Summary Judgment will be granted as to all of

Dr. Dennison's claims and counts of the Amended Complaint.

**I.      Facts**

Dr. Dennison was employed at the University from January 24, 2007 until March 31,

2020.  (ECF No. 59, at 3, ₽ 9).  On January 24, 2007, Dr. Dennison was appointed to the position

of Assistant Dean of Students, Associate Director of Residence Life at the University.  (ECF No. 59, at 3, ℙ 8).  On December 17, 2012, Dr. Dennison's title was changed from Assistant Dean of Students for Campus Living/Learning and Associate Director of Residence Life to Director of Residence Living.  (ECF No. 59, at 3-4, ℙ 10).  Dr. Dennison was reappointed to the position of Director of Residential Living effective July 1, 2015 through June 30, 2017.  (ECF No. 59, at 4, ℙ 11).  Dr. Dennison was then appointed as the Executive Director, Housing, Residential Living and Dining.  (ECF No. 59, at 4-5, ℙ 12).

When Dr. Dennison was first promoted to Director of Residential Living in 2013, she reported to Dr. Rhonda Luckey and Michael LeMasters, who were in Dr. Dennison's direct chain-of-command.  (ECF No. 59, at 40, ℙ 68, at 87, ℙℙ 8-9).  In 2018, following Dr. Luckey's retirement, Dr. Charles Fey became the Interim Vice President for Student Affairs.  (ECF No. 59, at 41-42, ℙ 70).  Dr. Fey was Dr. Dennison's supervisor until June 2019, when Dr. Fey was replaced by Dr. Segar as the permanent Vice President of Student Affairs.  (ECF No. 59, at 10-11, ℙℙ 30, 33).  Thereafter, Dr. Dennison reported to Dr. Segar.  (ECF No. 59, at 93, ℙ 33).

In October 2019, Dr. Segar implemented organizational changes to the Division of Student Affairs at the University.  (ECF No. 59, at 31, ℙ 53).  As a result, the housing and dining operations reported directly to the Vice President.  (ECF No. 59, at 31, ℙ 53).  Pursuant to this reorganization, Dr. Dennison's position was changed to Director of Residence Life, and Valeri Baroni's position, which had been a direct report of Dr. Dennison, was changed to Director of Housing and Dining.  (ECF No. 59, at 33, ℙ 55).  As a part of this reorganization, Ms. Baroni now reported directly to Dr. Segar.  (ECF No. 59, at 36-37, ℙ 60).  Dr. Segar testified that he told President Driscoll that the change was made due to

> the need I had to have more direction and more information about that area that I didn't feel Dr. Dennison was able to provide.  And that it just made more sense to

2

have that position report to me with a need to provide the guidance and direction
that [sic] I felt that area was receiving.  I also shared that I thought it was an
opportunity to have a more streamlined organization, a flatter organization.

(ECF Nos. 59, at 32-33, ¶ 54; 42-9, at 29).  Dr. Segar also explained to Dr. Dennison that the

change in position title "reflected her duties and having oversight of residence life since housing

and dining were no longer part of [her] oversight."  (ECF Nos. 59, at 37, ¶ 62; 42-9, at 38).  Dr.

Segar also explained in his deposition that the change in department structure occurred because

of his concerns about his "inability to get information from [Dr. Dennison], because she would

have to go to Val Baroni for that information and that that in itself was inefficient."  (ECF Nos.

59, at 37-38, ¶ 63; 42-9, at 39).

The COVID-19 pandemic reached Pennsylvania in early March 2020 as the University

was heading into spring break.  (ECF No. 59, at 99-100, ¶¶ 54-55).  On Sunday, March 15, 2020,

the University announced that, because of the COVID-19 pandemic, the University was

switching to remote instruction through the end of the semester such that all on-campus students

(who were on spring break at the time) must return to campus and move out of the residence

halls by Saturday, March 21, 2020.  (ECF No. 59, at 100, ¶ 56).

During the week of March 16, 2020, the resident directors and resident assistants, who

reported to Dr. Dennison, helped students and their families move out of the residence halls.

(ECF No. 59, at 101, ¶ 61).  At the beginning of that week, the staff was physically located in the

residence halls, stationed at desks that were visible to students and families.  (ECF No. 59, at

101, ¶ 61).  The students and families were to notify staff when they had checked out, but many

just retrieved their belongings and left without providing such notice.  (ECF No. 59, at 101, ¶

62).  During that week, the staff began to share their safety concerns about working in-person

and interacting with students and families.  (ECF No. 59, at 101, ⁋ 63).  At said time, most other University employees were working remotely.  (ECF No. 59, at 101, ⁋ 64).

On Thursday, March 19, 2020, Dr. Dennison spoke with Ms. Baroni, suggesting implementation of an express check-out, whereby students could drop off their room keys and leave without direct interaction with staff.  (ECF No. 59, at 104, ⁋ 79).  Ms. Baroni told Dr. Dennison that she did not believe an express check-out was practical and that she wanted to try to get a head count on check-outs.  (ECF No. 59, at 105, ⁋ 83).  Ms. Baroni told Dr. Dennison that, if Dr. Dennison disagreed, Dr. Dennison could talk to Dr. Segar.  (ECF No. 59, at 105, ⁋ 83).  Dr. Dennison testified that she then called and emailed Dr. Segar multiple times that day to discuss the proposed changes.  (ECF No. 59, at 106-107, ⁋⁋ 87-88).  On March 19, 2020, Dr. Dennison went to Dr. Segar's office to speak with him about implementing a virtual check-out process.  (ECF No. 59, at 107, ⁋ 89).  Dr. Dennison testified that she told Dr. Segar, "what was happening with my staff and that I wanted to do an express checkout, I thought it was in the best interest of the students and the staff, and Valerie was opposed to it, but I believed it was the best option."  (ECF No. 59, at 107, ⁋ 89).  Dr. Segar, in turn, responded that those resident directors, who did not want to work in person, could take leave time.  (ECF No. 59, at 107, ⁋ 90).  Dr. Dennison responded that she did not think that it was appropriate to force the resident directors to take leave time as they lived on campus and would still be working, albeit remotely.  (ECF No. 59, at 107, ⁋ 91).  Dr. Segar then told Dr. Dennison, "you do what you think you have to do."  (ECF No. 59, at 108, ⁋ 92).

The next morning, on Friday, March 20, 2020, Dr. Dennison met with Housing staff and announced her decision to convert to an express check-out.  (ECF No. 59, at 108, ⁋ 94).  Dr. Dennison's staff posted signs around the residence halls with the resident directors' phone

numbers and safety instructions for students and staff.  (ECF No. 59, at 108, ⁋ 95).  Dr. Dennison informed the different entities on campus, including the University police, about the change to the express check-out process.  (ECF No. 59, at 108, ⁋ 95).  Later that morning, Dr. Dennison conducted a Zoom call to announce the change to the express check-out process.  (ECF No. 59, at 109, ⁋ 99).  The attendees at the meeting included representatives from University Police, the Health Center, Information Technology, one of Ms. Baroni's reports, a few of Dr. Dennison's reports, as well as various graduate assistants and student staff who were also invited to the meeting.  (ECF No. 59, at 109, ⁋ 99).  On the call, Dr. Dennison announced that the graduate students, who remained on campus to help the students check-out of residence halls, could go home immediately, and residence directors were responsible to remotely handle any calls and questions from their residence hall apartments.  (ECF No. 59, at 109, ⁋ 100).

Following the Zoom call, Dr. Dennison sent Dr. Segar and Ms. Baroni an email communicating the change to the express check-out process for the residence halls.  (ECF No. 59, at 110, ⁋ 104).  Dr. Segar and Ms. Baroni did not approve of Dr. Dennison's decision to implement the virtual check-out process.  (ECF No. 59, at 112-115, ⁋ 111-125).  Dr. Segar called Dr. Dennison and told her that he was very upset with her decision to implement the virtual check-out process.  (ECF No. 59, at 113, ⁋ 116).  Dr. Dennison testified that during this call, Dr. Segar said that she was "responding based on her emotions which was a pattern with her."[1] (ECF No. 59, at 113, ⁋ 117).  Dr. Dennison also testified that, during this call, Dr. Segar told her that "he expected more from someone with your years of experience."[2]  (ECF No. 59, at 114, ⁋

---

[1] Dr. Segar testified that he does not specifically recall saying this, but he may have.  (ECF No. 59, at 113, ⁋ 117).
[2] Again, Dr. Segar testified that he does not specifically recall saying this, but he may have. (ECF No. 59, at 114, ⁋ 121).

121).  After this call, Dr. Segar stopped communicating with Dr. Dennison.  (ECF No. 59, at 114, ⁋ 124).  Dr. Segar testified that after Dr. Dennison implemented the virtual check-out process, he lost confidence in and questioned her leadership.  (ECF No. 59, at 114, ⁋ 124).

Craig Bickley, Associate Vice President of Human Resources, testified that, the week after Dr. Dennison made her unilateral decision to implement remote check-out procedures, there was a conversation among President Driscoll and his cabinet that, in light of the pandemic and the University transitioning to remote work, "if we had dead wood that we needed to get rid of now was the opportunity to do so."  (ECF Nos. 59, at 116-17, ⁋ 132, at 118, ⁋ 138; 42-10, at 9).  Mr. Bickley testified that this was "the exact wording that I had in the conversation."  (ECF No. 42-10, at 9).  Mr. Bickley also testified that he used the phrase "dead wood" when speaking with his boss, Dr. Debra Fitzsimmons, about the layoffs that were being conducted that week.  (ECF No. 42-10, at 10-11).  President Driscoll, Dr. Segar, and Dr. Fitzsimmons all dispute that the term "dead wood" was used in this meeting or that it was directed towards Dr. Dennison.[3]  (ECF No. 59, at 116-17, ⁋ 132).  Mr. Bickley also testified that the week before Dr. Dennison was terminated, which was the week after she implemented her unilateral remote check-out decision, Mr. Bickley spoke with Dr. Segar and said, "if there's somebody we can eliminate and we won't miss them, that's who we need to, you know, go and rid ourselves of."  (ECF Nos. 59, at 118-19, ⁋ 138; 42-10, at 21).  Dr. Segar responded, "I know who I'm recommending."  (ECF Nos. 59, at 119, ⁋ 139; 42-10, at 22).  During the week of March 23, 2020, Dr. Segar recommended to President Driscoll that Dr. Dennison be terminated.  (ECF No. 59, at 119, ⁋ 140).  President

---

[3] Dr. Fitzsimmons specifically denies that anyone used the term "dead wood" to describe the employees being terminated in late March 2020.  (ECF No. 42-8, at 32-34, 43).  President Driscoll and Dr. Segar were not questioned about the use of the term "dead wood" in their depositions, but they deny using the term.  (ECF No. 59, at 116-17, ⁋ 132).

Driscoll testified that Dr. Segar "mentioned that the contact-free checkout was implemented by Dr. Dennison without consulting" him.  (ECF No. 59, at 119, ℙ 142).  President Driscoll testified that he shared Dr. Segar's concern that Dr. Dennison did not consult Dr. Segar before implementing the virtual check-out process.  (ECF No. 59, at 119, ℙ 144).  President Driscoll further testified that he relied "heavily" on Dr. Segar's judgment in deciding to terminate Dr. Dennison.  (ECF No. 59, at 119, ℙ 146).

On March 31, 2020, eleven days after Dr. Dennison implemented the virtual check-out procedure, Dr. Dennison was advised by letter from President Driscoll that her employment at the University was terminated, effective immediately.  (ECF No. 59, at 6-7, ℙ 16).  The letter further stated that "[t]he purpose of this letter is to convey to you that senior leadership and I have lost confidence in your ability to effectively perform your assigned duties as Executive Director for Housing, Residential Living and Dining."  (ECF No. 59, at 7, ℙ 17).

Following Dr. Dennison's termination, Dr. Dennison's position was not formally filled, and her duties were assumed by Ms. Baroni, who was 37 years old, and 16 years younger than Dr. Dennison, at the time.  (ECF No. 59, at 79, ℙ 133, at 125, ℙ 168).  Over a year later, Dr. Segar re-combined the Director of Residence Life and Director of Housing and Dining into one position.  (ECF No. 59, at 126, ℙ 172).  Said position was reclassified at the University, and Ms. Baroni served in said position and received a pay raise.  (ECF No. 59, at 126, ℙ 172).  Dr. Segar also noted that additional responsibilities were added to Ms. Baroni's role as a result of this reclassification.  (ECF No. 59, at 126, ℙ 172).

## II.    Standard of Review

According to Federal Rule of Civil Procedure 56, a court must grant summary judgment where the moving party "shows that there is no genuine dispute as to any material fact" and the

moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  For a dispute to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 213 (3d Cir. 2017) (internal quotations omitted).  Additionally, for a factual dispute to be material, it must have an effect on the outcome of the suit.  *Id.*  In reviewing and evaluating the evidence to rule upon a motion for summary judgment, the court must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the" non-moving party.  *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014) (internal quotations omitted).  However, where "the non-moving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,'" the moving party is entitled to judgment as a matter of law.  *Moody*, 870 F.3d at 213 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

"The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  "Discredited testimony is not normally considered a sufficient basis for drawing a contrary conclusion. Instead, the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Id.* at 256-57 (internal citation omitted).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).  Judges are not "required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of the party." *Id.* at 251 (internal citation omitted).

III.    **Discussion**

A.  **First Amendment Retaliation**

Defendants argue that Dr. Dennison's speech regarding residence hall COVID-19 move-out protocols was made pursuant to her official duties as the Director of Residence Life, and that she was speaking as a University employee rather than as a public citizen.  (ECF No. 40, at 9).  Dr. Dennison argues that, because the University claims that she had overstepped the bounds of her responsibility in her statements regarding COVID-19 and University move-out protocols, such speech was made as a citizen rather than as a public employee.  (ECF No. 50, at 16).

"A public employee has a constitutional right to speak on matters of public concern without fear of retaliation."  *Baldassare v. New Jersey*, 250 F.3d 188, 194 (3d Cir. 2001).  "Public employees do not surrender all of their First Amendment rights by reason of their employment."  *Garcetti v. Ceballos*, 547 U.S. 410, 416 (2006).  "[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out."  *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (citation omitted).  To establish a First Amendment retaliation claim, a plaintiff must establish that "(1) he engaged in constitutionally protected conduct; (2) the defendant engaged in retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) a causal link existed between the constitutionally protected conduct and the retaliatory action."  *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019).

As to the first step of Dr. Dennison's First Amendment retaliation claim, a three-prong inquiry determines if the First Amendment protects a public employee's speech: "(1) whether the employee spoke as a citizen; (2) whether the statement involved a matter of public concern; and (3) whether the government employer nevertheless had an adequate justification for treating the

employee differently from any other member of the general public based on its needs as an employer." *Id.* at 753 (internal quotations omitted). "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 416.

In this case, Dr. Dennison argues that her speech regarding the virtual check-out procedures at the University was speech made as a public citizen. The undisputed record evidence, however, shows that Dr. Dennison's speech was made within her capacity as a public employee, employed by the University rather than as a citizen speaking on matters of general public concern. At the time Dr. Dennison made her alleged protected speech, Dr. Dennison served as the Director of Residence Life at the University. As a part of her duties as the Director of Residence Life, Dr. Dennison and housing staff organized and coordinated the effort to rapidly move students out of their dormitories during the COVID-19 pandemic circumstances at that time. Dr. Dennison was in charge of residential life at the University and supervised a staff of professional residential directors and student residential assistants. Dr. Dennison explains in her brief and in her deposition testimony that she first considered implementing a virtual check-out procedure because of the staff's increasing concerns about their risks of contracting COVID-19 while assisting in-person with the move-out procedures. Dr. Dennison testified that she decided to implement a virtual check-out process because of such concerns. The undisputed facts show that, after briefly consulting with Ms. Baroni and Dr. Segar, both of whom did not approve of the proposed changes, Dr. Dennison made her unilateral decision to implement the virtual check-out procedure. She announced this decision during a Zoom call and by email to University employees and relevant stakeholders. Dr. Dennison's decision impacted University

employees, University students living in the residence halls, and the parents of those students.

Dr. Dennison's speech directly related to matters within the scope of her position as a University

employee.  As such, Dr. Dennison's speech was made as a University employee concerning

University operations, not as a public citizen.

Under the next prong of the test, Dr. Dennison must prove that her statements were made

"as a citizen upon matters of public concern."  *Id.* at 421.  As to this prong, the district court

conducts a balancing test to determine if the plaintiff's speech is protected speech under the First

Amendment.  *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).  "Whether an employee's

speech addresses a matter of public concern must be determined by the content, form, and

context of a given statement, as revealed by the whole record."  *Connick v. Myers*, 461 U.S. 138,

147-48 (1983).  "The content of speech on a matter of public concern generally addresses a

social or political concern of the community."  *Borden v. Sch. Dist. of E. Brunswick*, 523 F.3d

153, 169-70 (3d Cir. 2008).  "[T]he inquiry into the protected status of speech is one of law, not

fact."  *Connick*, 461 U.S. at 148 n. 7.  "Whether a particular incident of speech is made within a

particular plaintiff's job duties is a mixed question of fact and law."  *Flora v. County of Luzerne*,

776 F.3d 169, 175-76 (3d Cir. 2015).  "[T]he scope and content of a plaintiff's job

responsibilities is a question of fact, but the ultimate constitutional significance is a question of

law"  *Id.*  Factors relevant to the court's analysis include: the employee's duties, the impetus for

his or her speech, the setting and subject matter of that speech, and the identities of the

individuals to whom that speech is addressed.  *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538,

546 (6th Cir. 2007).  The court may also consider "whether the speech was made inside or

outside of the workplace and whether it concerned the subject-matter of the speaker's

employment."  *Handy-Clay v. City of Memphis*, 695 F.3d 531, 540-41 (6th Cir. 2012).

Applying said factors to the facts at present, Dr. Dennison's speech was not made as a citizen on a matter of public concern; it was made as an employee of a public university discussing and directing university operations.  There is no evidence in the record to support any other conclusion.  Dr. Dennison's speech was directly made by virtue of her position as the Director of Residence Life.  Her speech resulted in a change of University policy by all who were subject to her authority.  That she may have exceeded the bounds of her authority to cause negative consequences with her supervisors, does not alter that her speech was clearly made as an employee.  Even if Dr. Dennison did not have the proper authority to make this speech and to implement a virtual check-out process, the record evidence shows that Dr. Dennison made this decision in her role as the Director of Residence Life and related to housing operations within the scope of said role.  Even if Dr. Dennison did not have the authority to unilaterally implement a virtual check-out, the record evidence shows that Dr. Dennison believed she had the authority to make this decision and that she believed she was making this decision within the scope of her duties as the Director of Residence Life.  As such, the Court finds that Dr. Dennison's speech was made as an employee of a public university concerning University matters, rather than general matters of public concern.  As such, the Defendants' Motion for Summary Judgment will be granted as to Dr. Dennison's First Amendment retaliation claim.

## B.  Exhaustion of Administrative Remedies

Defendants argue that Dr. Dennison failed to exhaust her administrative remedies with regard to her employment discrimination claims because she filed her Complaint prior to receiving a right to sue letter from the EEOC.  (ECF No. 40, at 14-16).  Dr. Dennison argues that she properly exhausted her administrative remedies for her employment discrimination claims as she filed the Complaint after she had received a right to sue letter from her first EEOC charge

12

and that she filed an Amended Complaint after she received a right to sue letter from her second EEOC charge. (ECF No. 50, at 26-27).

Prior to bringing a civil action in court, the plaintiff must first file a charge of discrimination with the EEOC within 300 days of the alleged unlawful employment practice. *Burgh v. Borough Council of Borough of Montrose*, 251 F.3d 465, 469-70 (3d Cir. 2001). The EEOC will then investigate the allegations in the charge. *Id.* at 470. Once the investigation is complete, the EEOC notifies the charging party that it has concluded its investigation, and it issues a Right to Sue Letter. *Id.* A plaintiff seeking to bring suit in court must file her complaint within ninety days of the date on which she "has notice of the EEOC's decision not to pursue the administrative charge." *Id.*; *see also* 42 U.S.C. § 2000e-5(f)(1). "While procurement of a right to sue letter from the EEOC is a condition precedent to filing an ADA suit, the failure to obtain notice of the right to sue is a curable defect." *Yallum v. Meadows Racetrack & Casino*, No. 12-823, 2012 WL 5877585, at *2-*3 (W.D. Pa. Nov. 5, 2012). In a similar case, the Western District of Pennsylvania found that the receipt of a right to sue letter at an early stage of the lawsuit, which was received prior to any discovery taking place, "is sufficient to cure her failure to obtain the letter before seeking relief in federal court." *Id.* at *3.

In this case, Dr. Dennison filed her first EEOC Charge on April 28, 2020, where she checked the boxes for age, disability, and race (in error) discrimination. (ECF No. 50, at 25). In the body of the charge, she also alleged that she was subject to gender discrimination, including that her male counterparts were treated more favorably than she was. (ECF No. 50, at 25). In the meantime, Dr. Dennison filed a second EEOC Charge on July 14, 2020. (ECF No. 50, at 26). Dr. Dennison checked the boxes for sex, age, disability, and retaliation on her Second EEOC Charge. (ECF No. 50, at 26). Dr. Dennison received a Right to Sue Letter from the EEOC for

her first EEOC Charge on August 6, 2020.  (ECF No. 50, at 25-26).  Dr. Dennison filed her

Complaint in this Court on October 16, 2020, which was within 90 days of receiving her first

Right to Sue Letter.  (ECF No. 50, at 26).  Dr. Dennison's Complaint brought forth claims

pursuant to the ADEA, ADA, and Title VII.  (ECF No. 50, at 26).  Dr. Dennison also explained

in her initial Complaint that she had filed a Second EEOC Charge, stated the contents of the

allegations included in the Second EEOC Charge, and that she would move to file an Amended

Complaint once the charges in her Second EEOC Charge were administratively exhausted.  (ECF

No. 50, at 26).  Dr. Dennison received a Right to Sue Letter from the EEOC for her second

EEOC Complaint on January 29, 2020.  (ECF No. 50, at 26).  Dr. Dennison requested leave to

file her Amended Complaint on April 29, 2021, which was uncontested by the Defendants.

(ECF No. 21).  The Court granted Dr. Dennison's Motion, and Dr. Dennison filed an Amended

Complaint on April 29, 2021.  (ECF Nos. 22 & 23).  As such, the case proceeded through

Discovery.

 Discovery is now completed, and the Defendants argue for the first time that Dr.

Dennison's employment discrimination claims should be dismissed for failure to properly

exhaust available administrative remedies.  Considering the procedural history in this case, the

Court finds the *Yallum* case cited in Dr. Dennison's brief persuasive.  Dr. Dennison properly

exhausted her administrative remedies with regard to her first EEOC Charge.  The allegations

contained in both the first and second EEOC Charges were similar and based upon the same set

of facts.  Although Dr. Dennison filed her Complaint in this Court prior to receiving a Right to

Sue Letter for her second EEOC Charge, she had properly received a Right to Sue Letter for her

first EEOC Charge.

As such, the Court considers Dr. Dennison's initial filing of her Complaint prior to receipt of her second Right to Sue Letter a curable defect, which was cured by the April 29, 2021 Amended Complaint.  The Defendants have not demonstrated how Dr. Dennison's Amended Complaint has prejudiced their case in anyway.  Therefore, Defendants' Motion for Summary Judgment for failure to exhaust administrative remedies will be denied, such that Dr. Dennison may proceed with her claims in this case.

### C.  Title VII and Title IX Gender Discrimination Claims

The Court identifies two gender discrimination claims within Dr. Dennison's Amended Complaint.  Her first gender discrimination claim concerns her alleged October 2019 demotion.  Her second gender discrimination claim arises from her March 2020 termination.

Title VII prohibits an employer from discriminating against its employees on the basis of sex.  42 U.S.C. § 2000e-2(a)(i).  Similarly, Title IX prohibits an employer, who receives federal funding, from discriminating against its employees on the basis of sex.  20 U.S.C. § 1681(a).  Courts apply the same legal standard for Title VII and Title IX gender discrimination claims.  *Summy-Long v. Pa. State Univ.*, 715 F. App'x 179, 182 (3d Cir. 2017).  Gender discrimination claims are analyzed under the *McDonnell Douglas* burden-shifting framework.  411 U.S. 792 (1973).

Initially, Dr. Dennison must establish a prima facie case of gender discrimination.  A plaintiff can establish a prima facie gender discrimination case by showing: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) this occurred under circumstances that raise an inference of discriminatory action.  *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003).

If Dr. Dennison establishes a prima facie case for gender discrimination, the burden shifts to the Defendants to articulate a legitimate, nondiscriminatory reason for why she received such treatment. *McDonnell*, 411 U.S. at 802. The burden upon the Defendants at the second step of the *McDonnell Douglas* framework is "relatively light," and the employer need only introduce "evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 706 (3d Cir. 1994). Nevertheless, "[s]ubjective evaluations are more susceptible of abuse and more likely to mask pretext." *Weldon v. Kraft, Inc.*, 896 F.3d 793, 798 (3d Cir. 1990).

Dr. Dennison may then rebut the Defendants' legitimate reason with sufficient evidence supporting that said reason is mere pretext for intentional discrimination. *McDonnell*, 411 U.S. at 802. Pretext may be shown by offering facts that would allow the court to (1) disbelieve the employer's articulated legitimate reason for taking the adverse employment action; or (2) believe that an invidious discriminatory reason was more likely than not the real reason for the action. *Fuentes*, 32 F.3d at 764. "To show that an employer's legitimate reasons should be disbelieved, a plaintiff must offer evidence that would allow a fact finder to reasonably infer that *each* of the employer's proffered nondiscriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action." *Marione v. Metro. Life Ins. Co.*, 188 Fed. App'x 141, 144 (3d Cir. 2006) (citations and internal quotations omitted). To discredit a legitimate, non-discriminatory reason, the plaintiff must demonstrate "such weakness, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence." *Fuentes*, 32 F.3d at 765 (citation and internal quotations omitted).

Identifying other similarly situated individuals who are outside the protected class and were treated more favorable than the plaintiff is one way to show pretext. *Simpson v. Kay Jewelers*, 142 F.3d 639, 645 (3d Cir. 1998). "While 'similarly situated' does not mean identically situated, the plaintiff must nevertheless be similar in all relevant respects." *Opsatnik v. Norfolk Southern Corp.*, 335 Fed. App'x 220, 223 (3d Cir. 2009) (citation and internal quotations omitted). With regard to workplace discipline, the relevant factors to consider in determining whether individuals are "similarly situated" may include a "showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish the conduct or their employer's treatment of them." *McCullers v. Napolitano*, 427 Fed. App'x 190, 195 (3d Cir. 2011).

### 1. Prima Facie Case of Gender Discrimination

#### a. Alleged October 2019 Demotion

Defendants argue that Dr. Dennison was not demoted; but even if she was, there is no record evidence to support that such was based upon her gender. (ECF No. 40, at 21). Dr. Dennison does not specifically address how gender discrimination motivated her October 2019 demotion; rather, she generally argues that the University treated male employees more favorably than female employees. (ECF No. 50, at 45).

Under the *McDonnell Douglas* burden-shifting framework, Dr. Dennison must first satisfy her prima facie gender discrimination case. For the first and second framework prongs, it is undisputed that Dr. Dennison is a woman, and thus within a protected class under both Title VII and Title IX, and that she was qualified for her position.

The parties do not agree upon the third prong, adverse employment action.  An adverse action is "an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment."  *Komis v. Sec'y of the U.S., Dep't of Labor*, 918 F.3d 289, 292 (3d Cir. 2019) (internal quotations omitted).  "If an employer's act substantially decreases an employee's earning potential and causes significant disruption in his or her working conditions, a tangible adverse employment action may be found."  *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 153 (3d Cir. 1999).  Stated differently, an adverse employment action occurs when a reasonable person could find that their employment was "substantially worsened."  *Bearley v. Friendly Ice Cream Corp.*, 322 F. Supp. 2d 563, 577 (M.D. Pa. 2004).  "[T]he 'adverse action' element asks only whether an employer's actions resulted in a real and material worsening of an employee's working conditions."  *Shaffer v. Cranberry Township*, No. 2:19-cv-1481, 2021 WL 4710919, at *6 (W.D. Pa. Oct. 8, 2021).  For purposes of discrimination claims, "an adverse employment action may include something less than discharge, such as a demotion or job transfer, even without a loss of pay or benefits."  *Vera v. Pa. Higher Educ. Assistance Agency*, No. 1:09-cv-341, 2013 WL 1178232, at *7 (M.D. Pa. Feb. 26, 2013).  However, minor actions, such as lateral transfers and changes of title, are generally insufficient to constitute an adverse employment action.  *Langley v. Merck & Co., Inc.*, 186 F. App'x 258, 260 (3d Cir. 2006).  Additionally, reassignment positions must be "inferior to, rather than merely different from," the prior position in order to constitute an adverse employment action.  *Id.* at 261.

Dr. Dennison argues that, on its face, the title Executive Director, Housing, Residential Living and Dining as opposed to Director of Residence Life connotes less job responsibility and a less prestigious title at the University.  (ECF No. 50, at 29).  Dr. Dennison also argues that,

18

with the title change, she was no longer supervising Ms. Baroni or Ms. Baroni's five direct reports. (ECF No. 50, at 29). Dr. Dennison also argues that her direct reports and co-workers viewed her change of title as a demotion. (ECF No. 50, at 29). Finally, Dr. Dennison argues that, as a result of the title change, she lost her responsibilities on the Foundation for IUP, which owned the IUP campus residence halls. (ECF No. 50, at 29). Defendants do not dispute that Dr. Dennison's title was changed or that she no longer had direct control over Ms. Baroni, Ms. Baroni's direct reports, or the Foundation for IUP. (ECF No. 40, at 19-20). However, Defendants argue that Dr. Dennison's title change was only the result of the University's change in organizational structure, which does not connote an adverse employment action.

Dr. Dennison has not presented sufficient evidence to demonstrate that she suffered an adverse employment action by such University action. Although she lost some responsibility over housing and Ms. Baroni received a promotion, such evidence does not support that Dr. Dennison suffered an adverse employment action as a result of this title change. Dr. Dennison cites the case of *Jones v. School District*, 198 F.3d 403 (3d Cir. 1999) as demonstrating that a lateral transfer can result in an adverse employment action. In *Jones*, adverse employment action was found where a teacher, without any reduction in pay, lost his opportunity to teach physics and was required to teach at a reputedly difficult school. Here, Dr. Dennison has not articulated how her change in job title or shift of responsibilities worsened her job position. The reorganization did not worsen her job assignment or make her job more challenging, time consuming, or difficult. Her salary did not decrease and her new title remained at the same level within the University hierarchy. The reduction in supervisory responsibilities and her perception of demotion do not rise to the level of adverse employment action.

19

As such, the evidence does not satisfy Dr. Dennison's prima facie case for gender

discrimination with regard to the University's October 2019 reorganization and her change in

position.  The Defendants' Motion for Summary Judgment, as to said claims of Title VII and

Title IX gender discrimination, will be granted.

### b.  March 2020 Termination

Defendants argue that there is no evidence from the record to support Dr. Dennison's

claim that her termination was based upon her gender.  (ECF No. 40, at 21).  Dr. Dennison

argues that, because the University merely disciplined a male employee, while it terminated her,

she believes that she was discriminated against based on gender.  (ECF No. 50, at 44-46).

As regards her March 2020 termination, the parties agree that the first three prongs of the

*McDonnell Douglas* burden-shifting framework have been met.  As such, these will not be

further addressed herein.  The fourth prong for Dr. Dennison's prima facie case requires her to

show that her termination occurred under circumstances that raise an inference of discrimination.

Dr. Dennison argues that evidence that a comparable male employee was treated more favorably

than she was and Dr. Segar's comments that she had demonstrated a pattern of emotional

decision-making sufficiently raises an inference of discrimination.  (ECF No. 50, at 44-46).  The

Defendants argue that she has not met her burden to show that she was terminated based upon

her gender.  (ECF No. 40, at 21).

While Dr. Dennison argues that she was treated less favorably than a similarly situated

male, the two situations are not sufficiently comparable.  Dr. Dennison argues that the male

employee, Mr. Turner, was merely counseled rather than fired in response to his disclosure of the

identity of a graduate assistant who had tested positive for COVID-19.  (ECF No. 50, at 44-45).

Dr. Dennison was terminated because she made and implemented her decision to transition to a

residence hall virtual check-out process, where she did not have the authority to do so.  Although Dr. Dennison spoke with Ms. Baroni and Dr. Segar briefly about implementing a virtual check-out process, neither gave express consent for such process.  Dr. Dennison ultimately unilaterally made and implemented the change without their approval.  Dr. Dennison argues that the University's decision to counsel rather than terminate Mr. Turner raises an inference that her termination was motivated by gender discrimination.  The undisputed record evidence demonstrates that Mr. Turner's facts and circumstances leading to his discipline do not compare to those at issue in Dr. Dennison's termination.  As such, the evidence does not give rise to a question of material fact as regard an inference of gender discrimination in relation to Mr. Turner.

Dr. Dennison argues that Dr. Segar's comment that she had shown a pattern of emotional decision-making supports the inference that gender played an unlawful role in the University's decision to terminate her.  In the Third Circuit, "[s]tray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision."  *Fuentes*, 32 F.3d at 767.  However, courts in other circuits have found that comments made to female employees that decisions that are based on their "emotions" can be indirect evidence of gender discrimination.  *See, e.g.*, *Lindhall v. AirFrance*, 930 F.2d 1434, 1439 (9th Cir. 1991); *Moussouris v. Microsoft Corp.*, No. C15-1483JLR, 2018 WL 3584701, at *16-17 (W.D. Wash. July 11, 2018); *Blissett v. City of Debary*, No. 6:16-cv-953-Orl-40TBS, 2017 WL 1365606, at *3 (M.D. Fla. Apr. 14, 2017).  Dr. Segar's remark was made contemporaneous with his criticism of Dr. Dennison's decision about and implementation of remote check-out.  While stray remarks are not ordinarily given great weight, Dr. Segar's comment was made eleven days before Dr. Dennison's

termination.  Although Dr. Segar's comment did not directly reference Dr. Dennison's gender, other courts have held that such comments can establish indirect evidence of gender bias.  Given the temporal relation between the comment and her termination and given the direct link between the comment and her actions that led to her termination, there could be a question of fact as to whether Dr. Segar's comments establish any inference that gender played a part in the University's decision to fire Dr. Dennison.

### 2.  Defendants' Legitimate Non-Discriminatory Reason for the Termination

Assuming Dr. Dennison met her burden of proof on her prima facie gender discrimination case, the Defendants must offer a legitimate, non-discriminatory reason for her termination.  In this case, the Defendants state in their brief that Dr. Dennison was fired due to the Defendants' concerns with Dr. Dennison's judgment and leadership as well as the University's financial condition.  (ECF No. 40, at 23-24).

### a.  Poor Judgment and Leadership

The record evidence suggests that after Dr. Dennison implemented the virtual check-out process, Dr. Segar questioned her judgment and lost confidence in her leadership.  The record evidence suggests that Dr. Dennison did not receive pre-approval for her unilateral decision to implement a virtual check-out process.  She discussed the idea with both Dr. Segar and Ms. Baroni, each of whom resisted the virtual check-out process.  Although Dr. Segar and Ms. Baroni could have been more direct that they did not authorize a virtual check-out process, there is no evidence that Dr. Dennison received express permission to implement such a process.  In addition, even if Dr. Dennison had authority to implement a virtual check-out process, an employer is not required to agree with every decision made by one of its employees.  Dr. Segar testified that after Dr. Dennison made the decision to implement the virtual check-out process

without first obtaining proper approval, he had lost faith in Dr. Dennison's judgment.  It is not

for the Court to substitute its own business judgment for that of the University.  Thus, the Court

finds that her unilateral decision to implement a virtual check-out policy was a legitimate reason

to fire Dr. Dennison that was not motivated by gender.

### b.  The University's Financial Condition

Additionally, the Defendants offer that Dr. Dennison's termination was also based upon

the necessity of employee layoffs in response to the University's budget constraints.  Both male

and female employees were impacted by said layoffs in late March of 2020, which supports that

the decision to terminate Dr. Dennison was based upon legitimate budgetary constraint reasons

and not gender.  Thus, the Court finds that the Defendants have offered this legitimate, non-

discriminatory reason for the decision to terminate Dr. Dennison.

### 3.  Pretext Analysis

As the Defendants have met their burden under the second stage of the *McDonnell*

*Douglas* framework, the burden shifts to Dr. Dennison to offer evidence that the Defendants'

non-discriminatory reasons were offered as mere pretext.  Dr. Dennison has offered no evidence

to support that the Defendants' purported reasons for her termination were based upon an

impermissible gender bias rather than her disapproved decision or financial hardship reasons

asserted by Defendants.  There is no record evidence that the Defendants terminated Dr.

Dennison's employment on account of her gender.  As such, Dr. Dennison does not meet her

burden to show that the Defendants' proffered non-discriminatory termination reasons were mere

pretext.

The Defendants' Motion for Summary Judgment, as regard to Dr. Dennison's Title VII and Title IX gender discrimination claims, asserting her termination was on account of her gender, will be granted.  Judgment will be entered in favor of the Defendants on said claims.

### D.  Rehabilitation Act and ADA Disability Discrimination Claims

Dr. Dennison stipulated in her brief that she did not contest the dismissal of any disability discrimination claims brought pursuant to the Rehabilitation Act and ADA.  (ECF No. 50, at 10). As such, Defendants' Motion for Summary Judgment, as to Dr. Dennison's Rehabilitation Act and ADA disability discrimination claims, will be granted.  Thus, judgment will be entered in favor of the Defendants as to Dr. Dennison's Rehabilitation Act and ADA disability discrimination claims.

### E.  ADEA Age Discrimination Claims

As an initial matter, the individual Defendants[4] argue in their brief that Dr. Dennison's ADEA age discrimination claims must be dismissed against them, because she can only bring a claim for injunctive relief against individual defendants sued in their official capacities.  (ECF No. 40, at 31-34).  The individual Defendants are correct that Dr. Dennison cannot seek monetary damages against the individual Defendants sued in their official capacities under the ADEA; however, Dr. Dennison specifically asserts that she "seeks all available equitable remedies and injunctive relief, including, but not limited to, possible reinstatement and promotion."  (ECF No. 23, at 21).  Claims for declaratory and injunctive relief may be brought against government employees that are sued in their official capacities under the ADEA.  *Smith*

---

[4] Dr. Dennison did not bring an ADEA Age Discrimination claim against the University.  (ECF No. 23, at 21).  As Defendants describe in their brief, the University would be entitled to Eleventh Amendment sovereign immunity for any ADEA claim brought against it.  (ECF No. 40, at 31-32).

*v. Sec'y of Dep't of Envtl. Prot.*, 540 F. App'x 80, 82 (3d Cir. 2013) (ADEA and ADA claims);

*see also Koslow v. Pennsylvania*, 302 F.3d 161, 178 (3d Cir. 2002) (ADA claim).  Since Dr.

Dennison seeks prospective injunctive relief for her ADEA age discrimination claims against the

individual Defendants, the Court will proceed to analyze the merits of Dr. Dennison's ADEA age

discrimination claims against Dr. Segar and President Driscoll.

The Court identifies two ADEA age discrimination claims within Dr. Dennison's

Amended Complaint.  Her first ADEA age discrimination claim is in regard to her alleged

October 2019 demotion.  Her second ADEA age discrimination claim concerns her March 2020

termination.

The ADEA prohibits employers from, among other things, "discriminat[ing] against any

individual with respect to his compensation, terms, conditions, or privileges of employment,

because of such individual's age."  29 U.S.C. § 623(a)(1).  Age discrimination claims, in which

the plaintiff relies upon circumstantial evidence, proceed under the *McDonnell Douglas* burden

shifting framework.  *Showalter v. Univ. of Pittsburgh Med. Ctr.*, 190 F.3d 231, 234 (3d Cir.

1999).

Initially, Dr. Dennison must establish a prima facie case of age discrimination.  A

plaintiff can establish a prima facie case of age discrimination by pointing to evidence that: (1)

she is at least forty years old; (2) she was qualified for the position in question; (3) she suffered

an adverse employment action; and (4) she was ultimately replaced by someone sufficiently

younger (or the employer retained younger workers) to support an inference of discrimination.

*Id.*  If Dr. Dennison can make a successful prima facie case for age discrimination under the

ADEA, the burden shifts to the Defendants to articulate a legitimate, nondiscriminatory reason

for why she received such treatment.  *McDonnell*, 411 U.S. at 802.  Dr. Dennison may rebut the

legitimate reason submitted by the Defendants as mere pretext for intentional discrimination by producing sufficient evidence to support that the individual Defendants' purportedly legitimate reason is mere pretext. *Id.*

### 1. Prima Facie Case

#### a. Alleged October 2019 Demotion

Defendants argue that Dr. Dennison was not demoted in October 2019; and, even if she was, there is no record evidence to support that she was demoted based upon her age. (ECF No. 40, at 21). Dr. Dennison argues that impermissible age discrimination motivated her October 2019 demotion because she was replaced by a significantly younger employee. (ECF No. 50, at 28).

The parties agree that the first two prongs of the *McDonnell Douglas* burden-shifting framework are met in this case. Dr. Dennison was over 40 years of age, and she was qualified for her position. As discussed earlier, the evidence does not support that Dr. Dennison suffered an adverse employment action through her October 2019 demotion. As such, Dr. Dennison does not satisfy her prima facie case of age discrimination for her claim regarding the University's October 2019 restructuring. As such, the individual Defendants' Motion for Summary Judgment for such claim will be granted.

#### b. March 2020 Termination

Defendants argue that there is no record evidence to establish Dr. Dennison's claim that her employment was terminated based upon age discrimination. (ECF No. 40, at 36). Dr. Dennison argues that, since a younger employee assumed her duties and responsibilities after her termination, she is entitled to an inference of discrimination. (ECF No. 50, at 29).

As discussed above, the parties agree that the first, second, and third prongs of the *McDonnell Douglas* burden-shifting framework have been met.  Dr. Dennison was over 40, qualified for her position, and her termination was an adverse employment action.

The fourth prong of Dr. Dennison's prima facie case requires Dr. Dennison to show that her termination occurred under circumstances that raise an inference of age discrimination.  Dr. Dennison argues the fact, that Ms. Baroni, a younger employee, assumed Dr. Dennison's duties and responsibilities after her termination, supports an inference of discrimination.  (ECF No. 50, at 29).  The Defendants respond that Ms. Baroni did not initially fill Dr. Dennison's position as Director of Residence Life; rather, Ms. Baroni merely assumed some of Dr. Dennison's Director of Residence Life duties after Dr. Dennison's employment was terminated.  (ECF Nos. 40, at 36; 59, at 126, ¶¶ 168, 172).  The Defendants also argue that other employees assumed some of said Director of Residence Life duties.  (ECF Nos. 40, at 36; 59, at 126, ¶¶ 168, 172).  Dr. Dennison responds that, even if her position as Director of Residence Life remained vacant immediately after her termination, because the position of Director of Residence Life was eventually eliminated and Ms. Baroni assumed the Director of Residence Life duties into her role, she has proven an inference of discrimination.  (ECF Nos. 50, at 30; 59, at 126, ¶¶ 168, 172).

The record evidence shows, and both parties agree, that Ms. Baroni is a younger employee who was retained by the University.  Although it did not happen immediately following Dr. Dennison's termination, Ms. Baroni eventually absorbed the Director of Residence Life duties.  The fact that the University fired Dr. Dennison, a member of a protected age class, while it retained Ms. Baroni, a younger employee, could raise the inference of age discrimination.  As such, there is a question of material fact as to whether Dr. Dennison meets her prima facie case of age discrimination with regard to her termination.

27

### 2.   Defendants' Legitimate Non-Discriminatory Reason for the Termination

Assuming Dr. Dennison meets her prima facie case of discrimination, the burden shifts to the Defendants to offer a legitimate, non-discriminatory reason for the purported adverse action. The individual Defendants again offer that Dr. Dennison was fired due to her poor business judgment to implement the virtual check-out procedures.  (ECF No. 40, at 23-24, 37).  The individual Defendants also explain that the University was facing financial difficulties, which also motivated their decision to terminate Dr. Dennison after her decision to implement the virtual check-out process.  (ECF No. 40, at 23-24, 37).  As discussed above, the Court has found that the individual Defendants have offered legitimate, non-discriminatory reasons for Dr. Dennison's March 2020 termination.

### 3.   Pretext Analysis

As the individual Defendants have met their burden under the second stage of the *McDonnell Douglas* framework, the burden shifts to Dr. Dennison to offer evidence that the Defendants' non-discriminatory reasons for the alleged discriminatory behavior were offered as mere pretext.  Dr. Dennison argues that multiple comments from University leadership establish support that the reasons proffered by the individual Defendants were mere pretext.  (ECF No. 50, at 41-43).  Dr. Dennison argues that Dr. Segar, Mr. Bickley, and Dr. Fey each made comments from which a jury could conclude that Dr. Dennison's termination was motivated by age bias. (ECF No. 50, at 41).  She asserts that, after the virtual check-out incident, Dr. Segar called her and told her that he expected more from someone with her "years of experience."  (ECF No. 50, at 42).  Dr. Segar does not dispute that he said this during their phone conversation, but he says that he simply meant "someone that has been in a leadership role."  (ECF No. 59, at 126, ⁋ 173).

Dr. Dennison also points to record evidence that University employees used the term "dead wood" when discussing her employment at the University.  According to Mr. Bickey,

> There was a conversation with the president and cabinet that going into -- with the pandemic hitting and us shutting down the university and us being in a financial situation that this was an opportunity that if we had -- the exact wording that I had in the conversation, if we had dead wood that we needed to get rid of now was the opportunity to do so.  So that's one of the reasons Ms. Dennison's name came up.  It's why somebody else's name came up that we discharged the same day.

(ECF No. 42-10, at 9-10).  Mr. Bickley also testified that he used the term "dead wood" in a conversation with his boss, Dr. Fitzsimmons, while she was preparing for the cabinet meeting with President Driscoll.  (ECF No. 42-10, at 10).  Dr. Fitzsimmons specifically denies ever using or hearing the term "dead wood" in reference to Dr. Dennison.  (ECF No. 42-8, at 32-34, 43).

Dr. Dennison also argues that in the past, when Dr. Fey was the interim Vice President of Student Affairs prior to Dr. Segar, that Dr. Fey had commented on her age.  (ECF No. 50, at 43).  Dr. Dennison stated in her declaration that "Dr. Fey made broad joking statements about age and sex."  (ECF Nos. 49, ⁋ 47; 59, at 139, ⁋ 226).  Dr. Dennison also stated in her declaration that she once made a reference to a song from the 1970's or 1980's, and that Dr. Fey responded, "Oh, you are showing your age."  (ECF Nos. 49, ⁋ 48; 59, at 139, ⁋ 226).  Dr. Fey's stray comments regarding age do not impact this Court's pretext analysis.  The Third Circuit does not consider such stray comments where such were not made by the ultimate decision maker, and where the comments were temporally remote from the adverse employment action.  Presently, the ultimate decision maker was Dr. Driscoll, University President, based upon the recommendation of Dr. Segar.  As such, Dr. Fey's past comments cannot satisfy Dr. Dennison's burden of establishing pretext.

In support of her claim, Dr. Dennison cited the case of *Janes v. Chi. Bd. of Educ.*, No. 00 C 6128, 2002 WL 31628195 (N.D. Ill. Nov. 19, 2020), where the district court found that the

term "old deadwood" was linked to a school principal's desire to replace older teachers with younger teachers. The *Janes* case is distinguishable, however, as the plaintiff in that case was able to demonstrate additional facts beyond the phrase "old deadwood" that suggested a motive to discriminate against her because of her age. *Id.* at *4. In *Janes*, the decision maker indicated more than once that his plan was to bring in new, young, and energetic teachers and get rid of the "old deadwood" at the school. *Id.* He also had indicated he planned to energize the school by replacing "older teachers." *Id.* at *3.

Presently, the weight of the evidence suggests that the individual Defendants terminated Dr. Dennison based upon her poor decision to unilaterally implement a virtual check-out process, combined with a need for global University staff reduction due to financial constraints. The evidence shows that the precipitating motivation for Dr. Dennison's termination was her poor judgment and the University's consequential loss of confidence in her leadership. Further, the University staff reduction at the same time Dr. Dennison implemented the check-out process supports the legitimacy of the reasons for Dr. Dennison's termination. As such, Dr. Dennison has not met her burden to produce evidence to establish any question of material fact that suggests such weaknesses and inconsistencies in the individual Defendants' proffered legitimate business reasons so as to establish pretext.

The individual Defendants' Motion for Summary Judgment, as regards Dr. Dennison's ADEA age discrimination claim, concerning her termination, will be granted. Judgment will be entered in favor of the individual Defendants on said claim.

## IV.  Conclusion

Based on the foregoing, Defendants' Motion for Summary Judgment, concerning administrative exhaustion, will be denied. However, in all other respects, Defendants' Motion

for Summary Judgment will be granted.  Judgment will be entered in favor of the Defendants as to all claims and counts in the Amended Complaint.  Accordingly, an appropriate Order shall be entered.

DATE: _August 9, 2022_

Marilyn J. Horan
United States District Judge